UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDLANDS DEFENSE, ALLIANCE FOR THE WILD ROCKIES, and NATIVE ECOSYSTEMS COUNCIL,<br><br>          Plaintiffs,<br><br>v.<br><br>MEL BOLLING, in his official capacity as Forest Supervisor of the Caribou-Targhee National Forest, and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture,<br><br>          Defendants. | Case No. 4:19-CV-00245-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Wildlands Defense, Inc., Alliance for the Wild Rockies, and Native Ecosystems Council ("Plaintiffs") bring this civil action for judicial review against the United States Forest Service ("Forest Service") and Mel Bolling, the Forest Supervisor and chief representative for the Caribou-Targhee National Forest. Plaintiffs challenge the Forest Service's decision approving the Rowley Canyon Wildlife Enhancement Project ("Project") within the Caribou-Targhee National Forest, which authorizes the thinning of

existing juniper trees and prescribed burning to eliminate the threat of future catastrophic fire.

Plaintiffs seek judicial review of the Forest Service's June 17, 2019 Decision Memorandum (Decision Memo) pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et. seq*. ("APA"). Plaintiffs claim the Forest Service violated the National Environmental Policy Act 42 U.S.C. §§ 4321 *et. seq*. ("NEPA") by approving the Project under a categorical exclusion, contending extraordinary circumstances warrant further analyses in three areas. Specifically, Plaintiffs allege the Forest Service failed to sufficiently analyze wilderness qualities and attributes and roadless area characteristics; failed to sufficiently analyze impacts on the Columbian sharp-tailed grouse, a Forest Service sensitive species, and its habitat; and did not consider the cumulative effects of the Project with impacts from grazing. The Forest Service responds that it complied with NEPA by utilizing and applying a categorical exclusion, and that its finding that there are no extraordinary circumstances warranting further analysis is supported by the record.

Before the Court are cross motions for summary judgment which have been fully briefed and are ripe for consideration. (Dkt. 15, 18.) The Court conducted a video hearing on July 21, 2020, and took the motions under advisement. For the reasons outlined below, the Court will grant Defendants' motion and deny Plaintiffs' motion.

## BACKGROUND

The Rowley Canyon Wildlife Enhancement Project[1] is intended to improve and promote elk and deer winter habitat as well as improve habitat for ruffed grouse and the Columbian sharp-tailed grouse, and to work toward a more natural fire regime. Decision Memo, AR 40557 - 40558. Specifically, the Project's goals are to "increase vegetation resiliency," "diversify the age class and canopy structure," "manage the density of juniper areas," and restore "understories of the mountain brush and mahogany stands," to promote "resiliency" and minimize "the potential negative effects of a high intensity wildfire." Decision Memo, AR 40557 – 58. To achieve these goals, the Forest Service proposed to treat three distinct Treatment Areas comprising 1,666 acres of the 3,955 acre Project Area by selectively pre-felling juniper trees, and utilizing prescribed burning, to thin juniper canopy cover and eliminate the threat of future intense wildfire. AR 31009-31011; 31130; 40557-40558; 00467; 40320. Thereafter, desirable plant species would be seeded and planted to promote wildlife habitat and aid in restoration of plant communities within the treatment areas where needed. AR 40559. Project management practices and design features include post-treatment monitoring for noxious weed infestation and to ensure objectives are being met. AR 40567 – 68.

---

[1] The Project is located on the Westside District of the Caribou-Targhee National Forest. The Westside Ranger District is one of seven districts within the Caribou-Targhee National Forest. The Westside Ranger District borders the north end of Pocatello, Idaho, and stretches south into northern Utah. The Project is located in southeastern Idaho, within Bannock County, west of Downey, Idaho. AR 40557.

**MEMORANDUM DECISION AND ORDER - 3**

The Project's boundaries are within the Elkhorn Mountain Inventoried Roadless Area (IRA), which is comprised of approximately 41,800 total acres. AR 040562; AR 040346-040352. The Project Area is 3,955 acres, of which only 1,666 acres, or 4% of the IRA, will be treated. AR 040558.

The recreation, trails, and scenery supervisor for the Forest Service prepared a worksheet, finalized on April 26, 2019, describing the actual effect of Project activities upon wilderness qualities and attributes, and roadless characteristics. AR 40346 – 40352. The worksheet summarized the Project's effects on nine roadless characteristics, including: (1) soil, water and air resources; (2) sources of public drinking water; (3) diversity of plant and animal communities; (4) habitat for threatened or endangered species and species dependent on undisturbed areas of land; (5) primitive and semiprimitive classes of recreation; (6) reference landscapes for research study or interpretation; (7) landscape character and integrity; (8) traditional cultural properties and sacred sites; and (9) other locally unique characteristics.

Although the Elkhorn Mountain Roadless Area is not currently designated as wilderness, the evaluation considered the Project's effects on wilderness qualities and attributes, including: (1) untrammeled; (2) natural; (3) undeveloped; (4) special features; and (5) manageability as wilderness. AR 40346-40352.

The recreation, trails, and scenery supervisor concluded that the cutting of selected juniper trees and sagebrush/mixed brush, and prescribed spring and fall fire, would not change the existing natural appearing character of the Elkhorn Roadless Area; and would maintain mixed-age sagebrush and associated vegetation cover; enhance habitat; retain

scenic integrity; and enhance fall color long-term. AR 40347 – 48. She further concluded that the Project would not affect the area's suitability for wilderness designation in the future. AR 40349.

In the June 17 Decision Memo, the Forest Service addressed the impact upon the area's roadless characteristics and wilderness qualities. The Forest Service determined the Project will not lead to any significant impacts and no extraordinary circumstances warrant further analysis because no roads are being built; no timber harvest/removal from the Project Area is proposed; and roadless area characteristics will be maintained with project implementation. AR 40562. The Forest Service indicated that "all practical means have been employed to avoid and/or minimize environmental impact" upon visual resources. AR 40560.

On June 7, 2019, prior to the Decision Memo, a wildlife biologist from the Forest Service completed a biological assessment ("BA") concerning wildlife present in the area. AR 40444 – 40463. As part of that evaluation, the biologist assessed the potential effects of the Project on the Columbian sharp-tailed grouse (*Tympanuchus phasianellus columbianus*).[2] The evaluation contained a description of sharp-tailed grouse preferred habitat. AR 40449. The biologist noted that there is suitable sagebrush and mountain brush habitat within the Project area, particularly on the south end of the Project, but no sharp-tailed grouse were observed during wildlife surveys, and no known sharp-tailed

---

[2] Columbian sharp-tailed grouse are a medium-sized upland game bird with a light brown appearance, a pointed tail, and visible white spots on their wings. AR 36882. (Dkt. 1 ¶ 43.) Columbian sharp-tailed grouse, or CSTG, are endemic to big sagebrush, shrub-steppe, wheatgrass-fescue, pinegrass, mountain shrub, and riparian shrub plant communities in western North America. AR 36889.

**MEMORANDUM DECISION AND ORDER - 5**

grouse leks (communal breeding display areas) were within the Project area. AR 40449. The evaluation considered the potential direct, indirect and cumulative effects of the proposed project upon the sharp-tailed grouse and its habitat. AR 40450 – 40453.

The biologist concluded that the Project "may impact individuals, but will not likely contribute toward a federal listing or loss of viability to the population or species." AR 40453. The biologist's conclusion was based upon the following: (1) there are no leks within the Project area or within two miles of the Project boundary; (2) the area containing suitable mountain brush habitat "does not seem to be readily used by sharp-tailed grouse"; and (3) treatments will have a small, short-term (one season) impact of reducing the amount of habitat in the mountain brush community, then, as vegetation returns, the habitat quality for sharp-tailed grouse will improve. AR 40453. The evaluation further concluded that, because direct and indirect impacts to sharp-tailed grouse would be negligible, there would be "no cumulative effects from this project and any past, present and reasonably foreseeable future projects" on sharp-tailed grouse. AR 40453.

With reference to the BA, the Forest Service concluded in the Decision Memo there were no extraordinary circumstances with respect to the Project's impact on the sharp-tailed grouse. AR 40561. Relying upon the BA, the Forest Service concluded that the Project "may impact individual Columbian sharp-tailed grouse but will not likely contribute toward a federal listing or loss of viability" to the species. Decision Memo, AR 40561.

**MEMORANDUM DECISION AND ORDER - 6**

On May 30, 2019, a rangeland management specialist for the Forest Service completed a Range and Noxious Weed Report. AR 40311 - 40331. The evaluation set forth current conditions and desired future conditions, and analyzed the potential effects for weed spread in disturbed areas during project implementation. AR 40312 – 40314. The specialist recommended project design criteria to minimize weed infestation following treatment. AR 40314. Seed mix and seeding methods were analyzed as well, including plant recovery and potential effects on habitat following implementation of the Project. AR 40142 – 40144; AR 40559; AR 40395-40425; AR 00467-00469; AR 40436; AR 02643; AR 40079-40114; AR 40322; AR 40451-40457; AR 40198-40200; AR 31009-31011.

The impact of noxious/invasive weeds received consideration in the Decision Memo. AR 40560. To limit invasive expansion during and after the Project, the Forest Service incorporated the design criteria recommended by the rangeland management specialist in the range and noxious weed report: "Wash/clean equipment before entering area," "Avoid, as is practical, creating continuous areas of masticated mulch deeper than 3 to 4 inches which can inhibit plant growth," "Monitor project area for noxious weed infestations," and that "Monitoring post-implementation will ensure objectives are being met as well as determine re-treatment potential and invasion monitoring of noxious weeds." AR 40560; AR 40567-40568. The Decision Memo detailed that maintaining and increasing perennial bunchgrasses and forbs would be key to preventing and controlling establishment and dominance by non-native annual grasses such as cheatgrass, and that the Forest Service identified areas that could respond to treatment to restore understory

species. AR 45060. The Forest Service considered public input and incorporated it into the decision regarding invasive weed management, including the removal of broadcast burning in Treatment Area 3. AR 40559-40560; AR 40561; AR 02640-02642.

Finally, both the rangeland management specialist and the Forest Service biologist discussed the impact of grazing in the Range and Noxious Weed Report and in the BA. AR 40323; AR 40454. Grazing is currently implemented in the Project Area pursuant to the Forest Plan, regulations, and previous decisions issued consistent with NEPA. AR 40312-40331; AR 40323. The rangeland management specialist identified the current livestock management area and the anticipated effect post-treatment. The proposed Project included recommendations to contact livestock owners during project implementation and to coordinate Project activities with grazing. AR 40323. The rangeland management specialist considered the effect upon habitat that grazing would have, and recommended restriction from grazing the Project area until objectives are met as required by the Revised Forest Plan 3-42. The evaluation concluded that these objectives could be accomplished by reducing the grazing season and livestock numbers following prescribed burn for a period specific to the Project area. AR 40323. Additionally, the rangeland management specialist recommended that vegetation be monitored to ensure the desired future condition for shrub community type and percent of coverage. AR 40323.

The wildlife biologist discussed the impact of grazing upon big game habitat (elk and deer). Biological Assessment, AR 40454. He concluded that the Project would improve big game winter range through a "more open interspace allowing for an increase

in the number of browse plants within and adjacent to juniper cover as well as a diversification of the browse age structure." AR 40454. The biologist noted that the Project would not modify livestock permits, numbers, stocking rates, or timing of livestock grazing, and therefore concluded grazing would be appropriately managed to insure compatible forage conditions. AR 40454.

The effects of grazing are considered in the Decision Memo. AR 40560. The Forest Service conducts annual monitoring for grazing in the Project Area. AR 40314-40319. Importantly, the Forest Service explained in the Decision Memo that implementation of the Project would not increase livestock numbers or season of use, and proposed to implement the recommendations to rest the treatment areas from grazing per the Revised Forest Plan until Project objectives were met. AR 40560.

In the June 17 Decision Memo, the Forest Service concluded the project was categorically excluded from further analyses in an environmental assessment (EA) or an environmental impact statement (EIS) pursuant to 36 C.F.R. § 220.6(e)(6)—"Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." AR 40557-40568. The Forest Service concluded the categorical exclusion (CE) applied because the action taken was intended to improve wildlife habitat by using vegetation manipulation and levels of prescribed burning to reduce natural fuel build-up and improve plant vigor. AR 40561. The Forest Service relied upon the applicable resource specialists who reviewed the proposed action, and approved the Project's implementation

pursuant to the CE, on the grounds that the Forest Service did "not anticipate the Project [would] lead to any significant impacts or extraordinary circumstances." AR 40561.

This lawsuit was filed on July 1, 2019, shortly after publication of the Decision Memo. (Dkt. 1.)

## STANDARD OF REVIEW

### 1.      Review Under the APA

In the context of agency review, "[s]ummary judgment...serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the [] standard of review*"* under the Administrative Procedure Act. ("APA") *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Because of the Court's limited review under the APA, the summary judgment standard of Rule 56(a) does not apply when motions for summary judgment are determined in agency review cases. *See Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014). Therefore, the Court "is not required to resolve any facts in a review of an administrative proceeding." *Occidental Eng'g Co. v. I.N.S.,* 753 F.2d 766, 769 (9th Cir. 1985). Rather, the Court's purpose "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.*[3]

---

[3] The parties submitted statements of undisputed facts with each of their motions, and filed statements of disputed facts in response. The Court has considered these disputes in the context of the parties' arguments regarding the Forest Service's compliance, or lack thereof, with the analyses required by NEPA.

**MEMORANDUM DECISION AND ORDER - 10**

Under the APA, agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *rev'd on other grounds*. "An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, [or] if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"[T]his standard is highly deferential, presuming the agency action to be valid." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007)); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). The Court is to be "most deferential" when, as here, "the agency is making predictions, within its [area of] special expertise, at the frontiers of science." *Lands Council*, 537 F.3d at 993 (quotations and citation omitted); *accord Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). *See also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (When examining an agency's

"scientific determinations ... a reviewing court must generally be at its most deferential.")

(quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).[4]

However, the deference owed an agency is not unlimited. *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). The Court does "not automatically defer to any agency's conclusions, even when those conclusions are scientific." *Id.* (quoting *Marsh v. Or. Nat'l Resources Council*, 490 U.S. 360, 378 (1989)). Rather, the Court's review must be "sufficiently probing" to ensure that the agency's decision is "founded on a reasoned evaluation of the relevant factors." *Id.* at 995.

But the Court must uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted). "The court's task is not to make its own judgment," because "Congress has delegated that responsibility to the [agency]." *River Runners for Wilderness*, 593 F.3d at 1070. Instead, "[t]he court's responsibility is narrower: to determine whether the [agency's action] comports with the requirements of the APA...." *Id.* "The [agency's] action ... need only be a reasonable, not the best or most reasonable, decision." *Id.*, and the agency need only

---

[4] Plaintiffs argue that the United States Court of Appeals for the Ninth Circuit follows a narrower application of *Marsh* deference and employs a "rule of reason" standard of review, urging the Court to do the same here. Pls.' Response/Reply at 8-9. This is true, however, only if the dispute involves a predominantly legal question, such as an agency's threshold determination that NEPA does not apply. *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998). When the dispute concerns factual challenges, as it does here, the arbitrary and capricious standard applies and the agency is accorded a high level of deference. *Id.* at 667.

articulate a "rational connection between the facts found and choices made," *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The APA does not allow the Court upon review to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts. *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43. This is especially true in the context of management of Forest Service lands, for Congress has consistently acknowledged that the agency must balance competing demands when managing National Forests. *See United States v. New Mexico*, 438 U.S. 696, 716 n.23 (1978).

"Under the APA, courts must refrain from de novo review of the action itself and focus instead on the agency's decision-making process." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1158 (9th Cir. 1980). The Court's review is limited, therefore, to the administrative record to determine whether the federal agency considered relevant factors and reached conclusions that were neither arbitrary nor capricious. *Nw. Motorcycle Ass'n v. U.S. Dept. of Agric.,* 18 F.3d 1468, 1472 (9th Cir. 1994).

## 2.      Extra-Record Evidence – The Fite Declaration

Before reviewing the merits, the Court must resolve an initial evidentiary question. Plaintiffs seek to introduce the Declaration of Katie Fite, (Dkt. 15-2), to which the Forest Service objects to paragraphs 10 – 47. Fite, a former wildlife technician with the Idaho Department of Fish and Game, offers several opinions concerning the Project's effects upon plant communities, wildlife habitats, livestock grazing, weeds and weed control, fire risk, human-caused habitat fragmentation, and soil health. Decl. of Fite ¶¶ 10-47.

**MEMORANDUM DECISION AND ORDER - 13**

Plaintiffs assert that Fite's opinions are appropriate for the Court to take into account, because she explains the relevant factors the Forest Service failed to consider and, therefore, her opinions will help the Court understand how the Forest Service's challenged decision failed to comply with NEPA.

The Court may consider extra-record evidence where admission of that evidence (1) is necessary to determine "'whether the agency has considered all relevant factors and has explained its decision,'" (2) is necessary to determine whether "'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.'" *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004) (quoting *Sw. Ctr. For Biological Diversity v. U.S.F.S.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

Plaintiffs here invoke the relevant factors exception. Although this exception permits the Court to consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analyses, it does not permit the Court to use extra-record evidence to judge the wisdom of the agency's action. *Asarco*, 616 F.2d at 1160. Evidence may be admitted under this exception only to help the Court understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious. *See Asarco*, 616 F.2d at 1159. But the Court may not look to this evidence as a basis for questioning the agency's scientific analyses or conclusions. *Asarco*, 616 F.2d at 1160–61.

**MEMORANDUM DECISION AND ORDER - 14**

Here, the opinions expressed in the declaration question the Forest Service's science and reasoning. Therefore, the Court will not consider the Declaration of Katie Fite for the purpose of questioning the Forest Service's scientific judgments. *See San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) (finding the court abused its discretion by admitting declarations of experts and relying upon them to question the wisdom of the agency's judgments).

## DISCUSSION

The National Environmental Policy Act ("NEPA") "requires that federal agencies perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'" *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013) (quoting 42 U.S.C. § 4332(2)(C)). "When the Government conducts an activity, NEPA itself does not mandate particular results. Instead, NEPA imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23 (2008) (internal quotation marks and citations omitted).

An agency can comply with NEPA in three ways. It can prepare an environmental impact statement (EIS); it can prepare an environmental assessment (EA); or it can invoke a categorical exclusion (CE). An EIS is the most searching review. It is required for any action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EA is less searching. Its central function is to determine whether an EIS

is required. 40 C.F.R. § 1508.9. A CE allows an agency to avoid preparing either an EIS

or an EA. CEs are appropriate for "actions which do not individually or cumulatively

have a significant effect on the human environment and which have been found to have

no such effect." 40 C.F.R. § 1508.4. "Application of a categorical exclusion is not an

exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires

less than where an environmental impact statement or an environmental assessment is

necessary." *Salazar*, 706 F.3d at 1096 (citing 40 C.F.R. § 1508.4).

      "In some instances, before an agency takes action pursuant to a CE, the agency

must assess whether that action presents 'extraordinary circumstances in which a

normally excluded action may have a significant environmental effect,' necessitating

further environmental impact analysis." *Ctr. for Biological Diversity v. Ilano*, 928 F.3d

774, 781 (9th Cir. 2019) (quoting 40 C.F.R. § 1508.4); *Salazar*, 706 F.3d at 1096 (citing

40 C.F.R. § 1508.4); *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 (9th

Cir. 1999). The agency "must adequately explain its decision" that a project will not

cause significant effects to the environment. *California ex rel. Lockyer v. USDA*, 459

F.Supp.2d 874, 902-03 (N.D. Cal. 2006); 36 C.F.R. 220.6(c). "An agency satisfies NEPA

if it applies its categorical exclusions and determines that neither an EA nor an EIS is

required, so long as the application of the [CE] to the facts of the particular action is not

arbitrary and capricious." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456

n.5 (9th Cir. 1996).

      When conducting an extraordinary circumstances inquiry, the Forest Service must

first determine whether the proposed action involves certain natural resources present in

**MEMORANDUM DECISION AND ORDER - 16**

the area, such as "[i]nventoried roadless area or potential wilderness area" and "Forest Service sensitive species." *Ilano*, 928 F.3d at 782 (citing 36 C.F.R. § 220.6(b)(1)); *see also* 40 C.F.R. § 220.6(b)(1)(i), (iv). However, the "mere presence" of one or more of these resource conditions does not preclude the agency's use of a CE; rather, "[i]t is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id.*; 36 C.F.R. § 220.6(b)(2).

The agency is required to conduct scoping to determine whether a proposed action may have a significant effect on the environment, including whether such a cause-effect relationship exists. 36 C.F.R. § 220.6(c). The scoping process is used to "determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7. "Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).

Here, the Forest Service determined the Project fell within the CE for "Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." 36 C.F.R. § 220.6(e)(6).[5] One example of this type of exclusion is "thinning to improve

---

[5] Examples of such projects include, but are not limited to:
(Continued)

growth or to reduce fire hazard including the opening of an existing road to a dense timber stand." 36 C.F.R. § 220.6(e)(6)(ii).

The parties do not dispute that the Project falls within the category of activities excluded under 36 C.F.R. § 220.6(e)(6). Rather, Plaintiffs contend the Forest Service's analysis of extraordinary circumstances was flawed, because the Forest Service failed to sufficiently analyze the Project's impact upon the area's wilderness qualities and attributes and roadless characteristics, and on the Columbian sharp-tailed grouse. Plaintiffs argue also that the Forest Service failed to conduct a "cumulative effects" analysis that considered the combined impacts from cattle grazing together with Project activities. Pl. Brief at 15. (Dkt. 15-1.) As discussed below, the Court finds Plaintiffs have not shown that the Forest Service's decision to categorically exclude the proposed Project from further analyses violated NEPA.

## A.   *Wilderness Qualities and Attributes, and Roadless Characteristics*

Plaintiffs argue the Forest Service's conclusion of "no effect" upon the area's wilderness qualities and attributes is unsupported because the Project involves the "aggressive manipulation of 1,666 acres" consisting of felling trees, broadcast burning, and other activities which will significantly alter vegetation and habitat, and will have lasting visual impact. Plaintiffs contend that the Forest Service did not acknowledge and

---

(i) Girdling trees to create snags;
(ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;
(iii) Prescribed burning to control understory hardwoods in stands of southern pine; and
(iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor. *Id.*

.

consider Project effects upon wilderness qualities, and that the conclusion of no effect is simply implausible due to the nature of the anticipated activities. Plaintiffs further characterize the Project as tantamount to logging in a roadless area, which Plaintiffs contend requires a more searching review.

The Forest Service responds that the record demonstrates it considered the effects of the proposed Project activities on the relevant resource conditions, which include the roadless area's potential for designation as wilderness. The Court finds the administrative record shows the Forest Service was aware of its obligation to analyze the Project's effects upon wilderness qualities and attributes as well as upon roadless characteristics, and that it did so.

Roadless areas are significant "because of their potential for designation as wilderness areas under the Wilderness Act of 1964, 16 U.S.C. §§ 1131 – 1136." *Lands Council v. Martin*, 529 F.3d 1219, 1230 (9th Cir. 2008). The Forest Service is, therefore, obligated to consider this resource condition when determining whether extraordinary circumstances related to project activities will warrant analysis in an EA or EIS. 36 C.F.R. § 220.6(b)(1); (b)(1)(iv). The agency must "analyze the degree of the potential effect to determine whether extraordinary circumstances exist," and supply a "convincing statement of reasons why potential effects are insignificant." *Alaska Ctr. For Env't v. U.S. Forest Serv*., 189 F.3d 851, 859 (9th Cir. 1999); *Alliance for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1124 (D. Mont. 2013). The Court's role is limited to determining whether "the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." *Marsh v. Oregon Natural Resources Council*,

490 U.S. 360, 378 (1989). Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference. *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).

The Forest Service considered the effects of Project activities on wilderness qualities and attributes[6] and roadless characteristics in the worksheet finalized by the recreation, trails and scenery specialist on April 26, 2019. AR 40346 – 40352. The worksheet refers directly to the BA prepared on June 7, 2019, which more thoroughly discusses the expected change to existing habitat and vegetation conditions. AR 40457. In her analysis, the recreation specialist considered the degree to which project activities would impact resource conditions to determine if extraordinary circumstances existed.

For instance, the worksheet addresses the effects of Project activities upon the natural and untrammeled wilderness qualities of the area. The short term visual effect of activities such as tree felling, mastication grinding, and burning is acknowledged. But the Forest Service specialist explains that scenic integrity will be maintained and not altered long-term. The worksheet contains a description of the measures designed to maintain visual integrity, such as lop and scatter of branches to reduce the appearance of un-

---

[6] Although Congress reviewed the greater Elkhorn Mountain Roadless area for designation as Wilderness, it is not currently designated as such. AR 33952, 34063, S.B. 827. A full history of the Senate Bill can be found at the following public link: https://legiscan.com/US/bill/SB827/2019. The bill was read twice before being referred to the Senate Energy and Natural Resource Committee, with no further recorded action. The Forest Service has not otherwise recommended the Elkhorn Mountain Inventoried Roadless Area for wilderness designation. USDA Revised Forest Plan for the Caribou Nat'l Forest at 2-13, found at:  https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5229166.pdf

**MEMORANDUM DECISION AND ORDER - 20**

natural levels of slash and debris, and cutting of trees flush with the ground to reduce visibility. AR 40348, AR 40373. Elsewhere in the administrative record, it is noted that scattering of downed logs will follow the protocol set forth in the Revised Forest Plan, which prescribes a random distribution plan with an average of 11 logs per acre. AR 40457. The BA indicates that prescribed fires would be "limited," and appear as "small dots across the project area where small piles are burned." AR 40452. The Forest Service specialist concludes that vegetative growth will obscure burned areas after one year. AR 40347.

The recreation specialist concludes that the Project's long term results will enhance the visual aspects of the landscape, because the treated areas will be seeded and planted with desirable plant species such as bluebunch wheatgrass, basin wildrye, slender wheatgrass, western yarrow, lewis flax, big blue grass, and sagebrush. AR 40348, 40559, 40446. And, the wildlife biologist explains the overall purpose of the Project is to make the area more resistant to habitat altering high intensity wildfire, which risk has increased due to the proliferation of conifer tree cover that the Project is designed to reduce. AR 40446, 40452. As a result of her analysis, the recreation specialist determined that the potential negative effects did not amount to extraordinary circumstances precluding the use of the categorical exclusion, because the Project will not change the "long-term natural, ecological processes of vegetation regeneration, and succession of sagebrush/mixed brush plantings and juniper will persist with the proposed actions." AR 40347; AR 40557- 40568.

The Decision Memo, in reliance upon the conclusions set forth in the worksheet and in the BA, noted that no significant issues were identified by Forest Service specialists, and that all practical means would be employed to avoid or minimize environmental impacts to visual resources. AR 40560. The Forest Service therefore concluded in the Decision Memo that the Project's effects would not lead to significant impacts or extraordinary circumstances.

Plaintiffs essentially disagree with the Forest Service's conclusion, arguing that Project activities are so drastic they will be visually apparent for years, and thus are at odds with wilderness qualities and attributes. Pls' Response/Reply at 17. (Dkt. 19 at 21.) The Court finds, however, that the Forest Service identified Project impacts, including alterations to the visual integrity of the landscape, discussed mitigation measures and expected future results, and provided plausible reasons for its determination that the Project will not lead to any significant impacts or extraordinary circumstances with respect to wilderness qualities. The Court therefore finds there is a rational connection between the facts and the conclusions reached by the Forest Service in the Decision Memo.

Plaintiffs did not separately criticize the Forest Service's analyses of the Project's impacts to the area's roadless characteristics,[7] other than assert that the Project is at odds

---

[7] The Forest Service considered the impacts of Project activities on roadless area characteristics and discussed the degree of potential effect upon the identified resource conditions. AR 40350 – 40352. The Forest Service concluded that the Project will have no effect upon the nine roadless area characteristics identified, and will essentially result in stability, because there will be no change. The Forest Service reached its conclusion because the Project does not involve road building, road
(Continued)

**MEMORANDUM DECISION AND ORDER - 22**

with the roadless area's potential designation as wilderness, and characterize the project as tantamount to logging in a roadless area. Plaintiffs rely upon *Smith v. U.S. Forest Service*, 33 F.3d 1072, 1078-79 (9th Cir. 1994) and *Lands Council v. Martin*, 529 F.3d 1219, 1232 (9th Cir. 2008), both of which involved commercial logging activities in designated roadless areas, to support their argument that more extensive analyses are required. Plaintiffs' argument is not persuasive.

First, Plaintiffs do not challenge the applicability of the CE, which expressly allows for tree thinning and brush control, as well as prescribed burning. 36 C.F.R. § 220.6(e)(6)(ii), (iii), and (iv). The Project does not authorize logging in a roadless area. *See Native Ecosystems Council v. Marten*, CV17-77-M-DLC, 2018 WL 6480709 *16 (D. Mont. Dec. 10, 2018) (rejecting the plaintiffs' argument that a project approved under 36 C.F.R. § 220.6 was equivalent to logging). Trees will not be removed for commercial harvest and the Project will not include road construction or disturbance to the existing roadless features. AR 40340; n. 6, *supra*.

Second, *Smith* and *Lands Council* dealt with projects specifically authorizing commercial logging in roadless areas and "stand for the proposition that, 'when an agency is considering logging in roadless areas, the logging is environmentally significant and its environmental consequences must be considered.'" *Native Ecosystems Council v. Marten*, CV17-77-M-DLC, 2018 WL 6480709 *16 (D. Mont. Dec. 10, 2018). "Consequently, the Forest Service was required to disclose that project activities were

---

construction, or building of facilities, either temporary or permanent. AR 40351. In other words, the area will remain roadless. Plaintiffs did not challenge this conclusion.

going to occur in an area large enough to be a candidate for wilderness designation," which the Forest Service did not do in either case. *Id.*

In contrast here, scoping documents in the administrative record indicate the Forest Service considered Project impacts upon wilderness qualities and attributes, as discussed above, and found them to be insignificant. Ninth Circuit authority, including *Smith* and *Lands Council*, does not require more analysis. *Marten*, 2018 WL 6480709 at *16. *See also Alaska Ctr. For Env't*, 189 F.3d 851, 859 (requiring only that the court consider whether the Forest Service has provided a reasoned decision).

In sum, the Court finds that the Forest Service adequately considered the relevant factors, engaged in a reasoned analysis, and reached its conclusion that there are no extraordinary circumstances warranting further analyses of the wilderness qualities and roadless characteristics in an EA or EIS. Further, the conclusion was based on evidence supported by the administrative record. Plaintiffs' disagreement with the Forest Service's analyses are not sufficient for the Court to question the agency's expertise. After reviewing the Forest Service's analyses and the underlying scoping documents, the Court finds the Forest Service's conclusion was not arbitrary or capricious.

### B.    *Sensitive Species*

Plaintiffs argue the Forest Service's conclusion that the Project "may impact individual Columbian sharp-tailed grouse but will not likely contribute toward a federal listing or loss of viability," is arbitrary and not supported by the record. Plaintiffs advance two principal arguments. First, Plaintiffs contend that the uncertainty inherent in the Forest Service's determination is insufficient as a matter of law under NEPA, and argue

**MEMORANDUM DECISION AND ORDER - 24**

that *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774 (9th Cir. 2019), cited by the Forest Service, is distinguishable.[8] Second, Plaintiffs assert the Forest Service did not consider the Project's effects upon suitable sharp-tailed grouse habitat, both with respect to loss of sagebrush and mountain shrubland, and the potential for weed proliferation, following ground disturbance from equipment and prescribed burning. To the extent the Forest Service did address habitat loss, either by loss of suitable habitat or by invasion from noxious weeds, Plaintiffs contend the analyses were inadequate because the Forest Service did not consider the specific impact upon sharp-tailed grouse.

In response, the Forest Service argues its conclusion is directly supported by the holding in *Ilano*, and defends its analyses based upon the reasoning adopted by the Court of Appeals for the Ninth Circuit in that case. Second, the Forest Service contends the Project will have long-term positive effects upon sharp-tailed grouse habitat, because the area will be re-seeded following project activities, and weed management measures will be implemented, thereby enhancing habitat and protecting it from potential intense wildfire.

Contrary to Plaintiffs' first assertion, the Forest Service does not need to be "certain" that the Project will not cause significant effects upon an identified sensitive species. Uncertainty about the effect of project activities upon individual sharp-tailed grouse "is not enough to conclude that the finding of no extraordinary circumstances was

---

[8] *Ilano* was not mentioned in Plaintiffs' brief in support of their motion for summary judgment but was discussed in response to the Forest Service's argument that *Ilano* directly supports application of the CE.

arbitrary and capricious." *Ctr. For Biological Diversity v. Ilano*, 261 F.Supp.3d 1063, 1070 (E.D. Cal. 2017), *aff'd.,*, 928 F.3d 774 (9th Cir. 2019) (finding no fault with the Forest Service's conclusion that a project "may affect individual [spotted] owls, but is not likely to result" in a federal listing or loss of viability for the species as a whole). Rather, the Forest Service must examine the relevant data, and articulate a satisfactory explanation for its conclusion. *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 903 (N.D. Cal. 2006).

In contrast to the record before the Court regarding the presence of sharp-tailed grouse in the Project area, in *Ilano*, spotted owls, an identified sensitive species, were present in the project area, as were nesting trees. As the court noted, the administrative record reflected the Forest Service took care to ensure the project would not affect the owls' nesting trees and that the project's habitat reduction activities would retain nesting sites as well as other important habitat conditions for spotted owls. Consequently, the Forest Service concluded that the owls would benefit in the long run. The court recognized the Forest Service relied upon scientific studies and its own expert judgment to reach its conclusion, to which the court deferred. *Ilano*, 928 F.3d at 783.

Here, the Forest Service similarly concluded in the BA, and in turn the Decision Memo, that based solely upon the identified presence of suitable habitat, individual sharp-tailed grouse could be affected by the Project, but the Project would not have a significant effect upon the species as a whole. Consistent with *Ilano*, the Forest Service considered whether sharp-tailed grouse habitat existed, and identified treatment area three because it contained suitable mountain brush habitat. AR 40324, 40453, 40317, 40449.

**MEMORANDUM DECISION AND ORDER - 26**

As a result, the proposed Project activities did not include disturbance of the shrubland in this area. AR 40324, 40559-60. Rather, juniper is slated for removal, and the structure of the shrubland will be maintained. AR 40324, 40560.

The Forest Service biologist based his conclusion that individual sharp-tailed grouse may be affected, because the area will be treated during one season, which may temporarily reduce the amount of habitat in the mountain brush community; but, as vegetation returns, habitat quality for sharp-tailed grouse will improve. AR 40453. Consequently, the Forest Service concluded that improvements to sharp-tailed grouse habitat would benefit the species in the long run, by improving habitat and reducing the possibility of a catastrophic fire event. A similar approach was considered sufficient by the court in *Ilano,* despite the identified presence of the spotted owl and its habitat.

Plaintiffs contend the Forest Service's conclusion is flawed, however, because the Forest Service did not sufficiently document whether sharp-tailed grouse were present in the Project area. In other words, Plaintiffs contend that, had the Forest Service simply looked harder, it would have observed sharp-tailed grouse, and therefore would have examined the effects of the Project in more detail, like the Forest Service did in *Ilano*. Plaintiffs are critical that the Forest Service relied upon the absence of leks and did not conduct detailed wildlife surveys to ferret out the presence of sharp-tailed grouse in the Project area.

Plaintiffs' contention, however, is contradicted by the administrative record. The wildlife biologist responsible for preparing the BA drew upon his eight-years of experience conducting project specific surveys and pre-project general habitat surveys,

which he stated did not reveal the existence of leks in the Project area, nor within two miles of the Project boundary. AR 40453. The biologist noted that the closest known lek is "8.5 miles to the NE of the project area on private land." AR 40449. The record contains scientific studies establishing that lek counts are an accepted method of monitoring the sharp-tailed grouse population, as leks are "easy to locate and observe." AR 36903. The administrative record contains evidence also of wildlife surveys conducted during scoping, which confirm "no sharp-tailed grouse were observed" during them. AR 40449, 40440 – 40443.

Despite the lack of observed presence, the wildlife biologist recognized that a portion of the Project area contained mountain brush habitat suitable for sharp-tailed grouse, and assumed individual grouse could be present, despite the absence of evidence of "ready use" of the area by these birds during his visits to the area over the past eight years. AR 40453. The Court finds the wildlife biologist's statement of reasons sufficiently convincing to support the Forest Service's conclusion that Project activities occurring in areas of suitable sharp-tailed grouse habitat could affect individual sharp-tailed grouse, but are not likely to result in a federal listing or loss of viability of the species.

Next, Plaintiffs argue that the Forest Service did not adequately consider the Project's effect upon existing habitat suitable for sharp-tailed grouse, and the potential for invasion of noxious weeds following Project activities. Plaintiffs assert that Columbian sharp-tailed grouse rely upon certain plant communities, such as big sagebrush, cheatgrass-fescue, pinegrass, and mountain shrubs for cover, and that the long time

period necessary for recovery of these plant species after ground disturbance such as those planned by the Project could in turn create conditions for noxious weeds to invade disturbed and treated areas. Plaintiffs criticize the Forest Service's failure to consider the implication of habitat loss and weed proliferation, and the specific effects upon the sharp-tailed grouse. Thus, Plaintiffs find fault with the Forest Service's conclusion that overall habitat quality for sharp-tailed grouse would improve.

Plaintiffs' argument is belied by the record, which indicates the Forest Service thoroughly analyzed the issue of habitat loss and regeneration, as well as weed proliferation following ground disturbance in the area, and discussed why Project activities would not cause either habitat loss or noxious weed proliferation. First, there is support in the administrative record for the wildlife biologist's conclusion that overall habitat for the sharp-tailed grouse is expected to improve as vegetation returns the season after treatment. AR 40453. The wildlife biologist concluded that improvement would occur because there would be more openings within the mountain brush habitat, a more diverse age structure of the brush, and an increase in other plants, including forbs in the interspaces. AR 40453. This conclusion is supported by documentation of existing conditions demonstrating domination of the area by juniper, with few native shrubs and sparse native grasses mixed with cheat grass. AR 000466 – 67. The Project proposes to reduce juniper, and seed desirable plant species to promote habitat and aid in restoration of plant communities, including restoration of sagebrush and various grasses. Decision Memo, AR 40559.

In the Range and Noxious Weed Report, the rangeland management specialist discussed the need to manage wildland fuels, increase vegetation resiliency to disturbance, and implement a more "historic fire regime in the project area." AR 40312. Weed proliferation and its impact upon wildlife habitat, including habitat for sharp-tailed grouse, was analyzed in the report. Habitat enhancement for a variety of species is a stated goal of the Project. AR 40312. It was observed that methods of weed control were being consistently applied, such that presently, new infestations of noxious weeds and other invasives were rare and the number of existing infestations was declining. AR 40313. The rangeland specialist considered that weed spread was possible during disturbance and proposed to control the spread following the "most recent version of the Caribou-Noxious weed Strategy." AR 40314. The rangeland specialist determined that the Project area would be more at risk to grass invasion without the proposed treatment. AR 40321.

The record therefore reflects that the Forest Service identified and analyzed Project impacts upon habitat, and the potential for proliferation of weeds, and explained why Project activities would not adversely affect the Columbian sharp-tailed grouse population as a whole. In finding that individual birds may be negatively impacted in the short-term but the species would benefit in the long-run, the Forest Service relied upon scientific studies and its own expert judgment, to which the Court must defer. *Center for Biological Diversity v. Ilano*, 928 F.3d 774, 782 (9th Cir. 2019). The Court concludes the Forest Service considered all relevant factors before determining no extraordinary

circumstances would preclude the categorical exclusion of Project activities with regard to the sharp-tailed grouse.

### C.   *Cumulative Impacts – Grazing*

Plaintiffs argue the Forest Service "failed to analyze or consider the potential cumulative impacts of the Project, including the cumulative impacts of a Project designed to open up habitat understories, with the potential impacts of existing grazing use on roadless and wilderness values, and in particular on Columbian sharp-tail[ed] grouse habitat on the Project Area." Pls.'s Mem at 15-16. (Dkt. 15-1 at 17.) Specifically, Plaintiffs contend that the BA does not consider cumulative impacts from grazing upon the sharp-tailed grouse, and the Range and Noxious Weed Report does not mention that post-project grazing can degrade habitat conditions for sharp-tailed grouse. Plaintiffs contend the Forest Service's solution, which is to rest treated areas from grazing, does not adequately address the indirect and cumulative impacts of Project activities combined with grazing.

The Forest Service counters that Plaintiffs' argument is not supported by the administrative record, which contains ample evidence that the agency disclosed the existing livestock authorization, and both analyzed and considered the effects of grazing following treatment. The Forest Service contends that the record supports its determination that the prohibition of grazing after treatment until goals were met, as well as post-treatment monitoring of shrub cover and weed proliferation, adequately addresses concerns about habitat degradation and weed infestation caused by grazing. And last, the Forest Service asserts it was not required to conduct an independent cumulative impacts

analysis so long as it satisfied its obligation to consider whether extraordinary circumstances existed.

NEPA allows a federal agency to adopt a categorical exclusion for a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. This regulation requires also that the agency "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id*. Under § 1508.27(b)(7), which defines the word "significant" for NEPA purposes, a determination of significance requires the agency to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." Therefore, to provide for extraordinary circumstances under § 1508.4, the agency must consider cumulative impacts. A "cumulative impact" "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. However, a detailed cumulative effects analysis typical of an EIS or an EA is not required since the project falls under a categorical exclusion. *Lands Council v. Packard*, No. CV05-210-N-EJL, 2005 WL 1353899, at *7 (D. Idaho June 3, 2005). *See also Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013) (explaining that 40 C.F.R. § 1508.25, which requires an analysis of cumulative impacts, applies when an EIS is required, not when applying a CE); *Native Ecosystems Council v. Marten*, 2018 WL 6480709 *16 (D. Mont. Dec. 10, 2018) *aff'd*, 800 F. App'x 543 (9th Cir. 2020) ("[I]f the Forest Service has satisfied its

obligation to consider extraordinary circumstances, no further cumulative effects analysis is needed.").

Contrary to Plaintiffs' first assertion, there is evidence in the record that the Forest Service considered the cumulative impacts of the Project by analyzing the current, reasonably foreseeable, and past activities over the last 20 years. AR 40446-40447. Within the BA, the wildlife biologist documented existing conditions, AR 40447 – 40452, and discussed the effects anticipated by the Project upon sharp-tailed grouse, finding none, AR 40453. *See Native Ecosystems Council*, 2018 WL 6480709 at 17 (finding it permissible under Ninth Circuit law to aggregate the past impact of activities into an environmental base line against which the incremental impact of proposed activities can be measured).

The rangeland management specialist separately considered the impacts from grazing within the Project area, disclosing the grazing allotment and discussing it in the Range and Noxious Weed Report and the Soil Resource Report. AR 40311 – 40331; AR 40432 - 40436. The rangeland specialist noted that the Project is not intended to increase the season of use or number of cattle, which allotment includes three pastures to support 252 cow-calf pairs from June 1 – September 30. AR 40323. The record reflects the Forest Service was aware the treatment areas would open understories, given the reduction in juniper density and the increase in growing space to brush and other understory species, such as grass and forbs. AR 40369, 40375. To adequately account for this concern, the Project would include monitoring of shrub growth to maintain the increase in perennial

bunchgrasses and forbs, and to correspondingly prevent cheatgrass dominance post-treatment. AR 40560.

The record similarly reflects the Forest Service was aware of the potential for noxious weed spread by grazing following treatment. To address the issue, the Forest Service intends to implement a monitoring plan to ensure proper grazing practices so as to prevent weed spread and maintain brush cover following treatment. AR 40311 – 40331; 038351 – 038420; 40362 – 40366; 038381, 038404 – 038420, 038387 – 038403, 038351 - 038367. The Project is expected also to reduce the risk of cheatgrass dominance by eliminating the risk of a future intense wildfire. AR 40436, 40354 – 40384.

Finally, there is evidence in the record to support the Forest Service's solution of resting treated areas from grazing to address the concern about grazing post-treatment, with the attendant soil disturbances and introduction of weeds that could occur. AR 40432, 40435, 33165 – 33175, 33312 – 33318. The Revised Forest Plan mandates that following any prescribed or natural fire, livestock grazing must be restricted "before seed set of the second growing season, or until objectives of the treatment are achieved," with efforts made to establish or maintain a variety of "desirable grass, forbs, and shrub species." RFP 3-42, Grazing Management. The rangeland management specialist incorporated the Revised Forest Plan's requirements in the Range and Noxious Weed Report, recommending that cattle be restricted from grazing the Project area until objectives are met as required by the Revised Forest Plan 3-42. The rangeland management specialist indicates this goal may be accomplished by reducing the grazing

season and livestock numbers following prescribed burns for a period specific to the

Project area. AR 40323. The Decision Memo incorporates the same criteria. AR 40560.

The Court finds the record reflects the Forest Service considered the cumulative

effects of this Project and concluded there would be no cumulative effects for wildlife,

either with respect to habitat loss or weed proliferation, as a result of Project activities.

The Forest Service considered the inherent tension between the stated goals of

maintaining shrub cover and reducing noxious weeds, and the potential for grazing to

frustrate both goals and thereby degrade habitat. The Forest Service determined that, by

resting areas from grazing, and implementing post-treatment monitoring of both shrub

cover and weed infestation, cumulative impacts from grazing would not be significant.

While Plaintiffs can certainly disagree with the Forest Service's conclusion that its

mitigation measures will not be adequate to address the synergistic effects of grazing

upon sharp-tailed grouse habitat, such disagreement does not change the fact the Forest

Service considered these important aspects of the problem. And, having done so, the

Forest Service need not conduct a further inquiry in the context of a categorical exclusion

analysis. *Native Ecosystems Council v. Marten*, 2018 WL 6480709 *16 (D. Mont. Dec.

10, 2018) *aff'd*, 800 F. App'x 543 (9th Cir. 2020).

The Court is satisfied that the Forest Service analyzed the impact of Project

activities together with the impact of post-treatment grazing, and that specialists

considered the cumulative effects of Project activities when determining whether

extraordinary circumstances existed. *See* AR 40444 – 40463, 40311 – 40331. The Court

concludes that the Forest Service considered the relevant factors with respect to the

**MEMORANDUM DECISION AND ORDER - 35**

impact of grazing upon areas proposed to be treated, engaged in a careful analysis, and reached a reasonable conclusion based on evidence supported by the record.

## CONCLUSION

Plaintiffs take issue with the depth and scope of the Forest Service's analyses, claiming that neither was adequate to support the Forest Service's finding that the proposed project will not lead to any significant impacts or extraordinary circumstances. But that is not the same as saying the Forest Service failed to conduct any analysis whatsoever. Within the administrative record, there are extensive analyses of the Project's effects upon all users, including animals and avian species who depend upon the habitat proposed to be treated. The Court must defer to the agency on matters within the agency's expertise unless the agency completely failed to address a factor that was essential to making an informed decision. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005). Based upon the Court's review of the record, the Forest Service's decision was based upon a consideration of the relevant factors and bears a rational connection between the facts found and the decision made to proceed with the Project activities. The Court therefore concludes Plaintiffs have not shown that the Forest Service's application of a categorical exclusion in this case was either arbitrary or capricious. The Forest Service's motion will be granted.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiffs' Motion for Summary Judgment (Dkt. 15) is **DENIED**.

2)      Defendants' Motion for Summary Judgment (Dkt. 18) is **GRANTED**.

The Court will prepare a separate form of judgment in favor of Defendants

pursuant to Fed. R. Civ. P. 58.

DATED: August 25, 2020

Honorable Candy W. Dale
United States Magistrate Judge